Joseph Kanakanui IOKEPA and Shirley Pualeilani Iokepa by Joseph Kanakanui Iokepa, her next friend, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 1405.

United States District Court
D. Hawaii.
Jan. 28, 1958.

Bouslog & Symonds, Honolulu, Hawaii, Harriet Bouslog, for plaintiffs.

Louis B. Blissard, U. S. Atty., Dist. of Hawaii, Honolulu, Hawaii, by Edgar D. Crumpacker, Asst. U. S. Atty., Dist. of Hawaii, Honolulu, Hawaii, for defendant.

WIIG, District Judge.

This action was brought against the United States of America under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), and the Hawaii Wrongful Death Act[1] by the father and minor sister of Russell Iokepa, a minor, who died on May 31, 1954 as the result of injuries suffered when a dud shell exploded on the Parker Ranch on the island of Hawaii.

Plaintiffs' claim is that the United States of America negligently left the dud shell on property belonging to the deceased's employer, which had formerly been used by the Government as a firing range and which was returned by the Government to the deceased's employer prior to the date of the accident.

Both the plaintiffs and the Government have moved for Summary Judgment based on admitted facts hereinafter set forth relating to conduct on the part of agents and employees of the Government, and which are taken from an amended pretrial order prepared by counsel and approved by the Court.

From December 1, 1943 until June 30, 1946, the Government, its agents, officers, servants, and employees, with the authorization and permission of the Parker Ranch, had possession, control, and custody of the area where the accident occurred and used it for a firing range on which live ammunition and other explosives were employed.[2] The license agreement, covering the area where the accident occurred, provided amongst other things that the Government would " * * * after the execution of each particular maneuver restore the premises substantially to their original condition, fill in foxholes, detonate and remove all unexploded bombs, and repair all other damage to the premises; * * * * " By agreement dated September 10, 1946, the Government surrendered its rights to the area in question and vacated the premises as of June 30, 1946. That agreement, which was supported by a substantial consideration, provided that the licensor, Parker Ranch, " * * * does hereby acknowledge that the Government has fully performed, complied with and discharged all obligations on the part of the Government to be kept and performed, and does hereby release the Government from further performance thereunder and quitclaim unto the Government any and all damages, claims and demands whatsoever arising out of or in any wise connected with the use and occupancy of the said premises under the terms of said license or in respect of such premises during the period of occupancy thereof by the Government."

Before the return of the firing range, on which the fatal explosion occurred, a two and one-half month search was made of the premises by duly authorized agents of the Government. This was done by details of men who, at arm's length distance, criss-crossed the range, making a visual search for dud shells. It was the opinion of the officer-in-charge that the area had been thoroughly policed for dud shells and was in satisfactory condition for return to the owner. This officer reported, however, that it was quite possible that there were "duds" at the base of cacti plants where it was "practically impossible" to search.

The manager of the Parker Ranch was acquainted with the difficulties in clearing the range and, before the area was returned, he was advised to report unexploded ordnance to military authorities.

■ The manager was advised of the extent of the search and of the possibility that duds were in the cacti beds, but he indicated that he was satisfied with the search conducted. However, after the final search had been completed, he was again advised that unexploded ammuni-

---

1. Sec. 10486, Revised Laws of Hawaii 1945.

2. The "firing range" and the "maneuvering area" covered an area of approximately 91,000 acres. Parker Ranch is reputed to be the second largest in the United States outranked by the King Ranch in Texas.

tion possibly still remained, and, for this reason, an employee of the ranch was instructed on how to detonate any duds found thereafter. These instructions were given by an Army colonel.[3] The colonel recognized the impracticability of reporting duds to military authorities because there were no military camps or installations on the island of Hawaii and no demolition units. This employee was given two (2) cases of 100 one-pound charges of TNT to use in detonating duds. The two hundred (200) charges of TNT were used, during the period between the time that the Government returned the property to the ranch and the date of the accident, to detonate duds which were found in the area of the former firing range. The ranch made no report of the discoveries of duds to military authorities at any time during this period.

After the return of the property, the ranch, through its foreman, from time to time warned its employees, including the deceased, not to handle dud shells and instructed them to mark unexploded duds discovered by them with a pile of stones and to report their existence to ranch authorities for disposal.

The circumstances leading up to the explosion on May 31, 1954 are not clear. As had been the practice of other employees in the past, Iokepa and another had picked up some shell casings while working on a fence line in the morning. The physical evidence indicates that the explosion took place on the forward edge of the tailgate of a truck used by the crew in its work. No witness could give direct testimony as to what took place, and none would admit to any knowledge of the dud shell which exploded and caused the injuries.

 There appear to be no Hawaiian cases defining the standard of care required in a situation comparable to the present one. Plaintiffs rely on Mark, Moo & Carter v. City & Co., 40 Haw. 338,

which was an action against a municipality based on the negligent maintenance of wiring and lighting fixtures in that they were so corroded, worn, and frayed that the electric current leaked out into the metal parts of lighting fixtures, causing damage to plaintiffs' houses, which conditions could have been easily ascertained upon reasonable inspection. The Court said at page 351:

"An inspection would have shown the dangerous condition of the insulators; and while the City and County is not an insurer in the operation of its electrical-lighting system and does not come within the doctrine of Rylands v. Fletcher, yet as electricity is doubly dangerous because it is invisible, noiseless and odorless, rendering it impossible to detect the presence of peril until damage is done, a municipality must exercise a care commensurate with the very dangerous instrumentality it employs."

Assuming that the Government was under a duty to exercise a high degree of care in its attempt to remove or neutralize all unexploded dud shells from the area, nevertheless such duty was not absolute and unqualified.

In Kurihara and Others v. United States, Civil 980–983 (D.C.Haw.1952, unreported), the Government was found negligent for its failure to clear a small island off the island of Oahu of unexploded shells after it had been used as a firing range. The Court said:

"That there was a clear duty on the part of the United States Government agents to do every reasonable and prudent thing to protect the aforesaid fishermen (plaintiffs) who went to Rabbit Island for fishing purposes against said danger from unexploded shells."

And in United States v. Inmon, 5 Cir., 1953, 205 F.2d 681, 684, the Court said:

---

3. The Army colonel states that he does not recall giving such instructions, nor advising the employee to detonate any duds. For the purpose of this ruling, the facts are assumed most favorably to the Plaintiffs.

"Assuming, however, that the employees of the United States owed a duty upon releasing the property to exercise ordinary care in removing or giving warning of the presence of explosives, so as to prevent injury to persons who they might reasonably have expected to use the Camp Wolters area, we think it clear that this duty was effectively discharged by the giving of adequate warning and the exercise of due care to make the premises reasonably safe."

■ Applying the foregoing tests to the admitted facts, it is apparent that the Government did exercise a high degree of care in removing, or attempting to neutralize, dangerous objects on this vast area before it was returned to its owner, and this is true even though it must be conceded that much ordnance was left on the land, or imbedded in the land, at the time of the return. It was, in fact, physically impossible under the circumstances to completely remove all of the potentially dangerous objects.

■ Plaintiffs urge that because the Government knew of the dangerous condition, it should have retained possession of critical areas until they were reasonably safe. Such a procedure might have prevented this unfortunate accident, but such course of conduct was not required. The evidence shows that reasonable and intelligent agents and employees, both for the Government and the ranch, after careful consideration, decided to act as they did.

■■ Both the Government and the Parker Ranch were aware of the possibility that, because of the terrain and the cacti beds, it was likely some unexploded shells might remain on the ranch lands. In this connection, the Government had a duty to give warning of this potential danger, which it did, and this warning had been conveyed to Iokepa. See United States v. White, 9 Cir., 1954, 211 F.2d 79 affirming D.C.N.D.Cal.1951, 97 F.Supp. 12. Kurihara v. United States, supra;

Restatement of the Law of Torts Sec. 353 com. (b), Sec. 354. Prior to May 31, 1954, the Government had never been informed of the discovery on the ranch of any unexploded shells, and, in the absence of such information under all circumstances as shown herein, no duty arose on the part of the Government to make a further inspection of the premises.

■ It is, therefore, concluded, that the Government performed its duty to reasonably clear the range of unexploded shells, and that it gave ample notice to warn of the possible hidden dangers of unexploded shells in the area. There being no evidence to support the claim that Iokepa's death was caused by any negligent or wrongful act, or omission, of a Government employee or agent, judgment must be rendered in favor of the Government.

■ After Iokepa's death, the Parker Ranch requested military authorities to conduct a further search of the ranch premises for dud shells. At a cost of approximately $67,000 for Army personnel, supplies and other services, and covering a period from September 14 to December 3, 1954, over 110,000 acres were inspected and 1,013 pieces of various types of explosives were neutralized. Plaintiffs contend that this evidence infers negligence on the part of the Government, citing II Wigmore on Evidence Sec. 283, pp. 158–159.

Such an inference, even if permitted, would not affect the conclusion that the Government was not negligent. The fact remains that, for a period of eight years, the Government had no notice whatsoever that any dangerous condition existed after it had already performed the duties incumbent upon it when the land was returned to the Parker Ranch. Pow Kee v. Wilder Steamship Co., 9 Haw. 57.

The Defendant's motion for a summary judgment in its favor is granted, and the plaintiffs' motion for summary judgment is denied.